UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEQUEZE LAMAR DIXON,

    Petitioner,

v.

SHERRY BURT,

    Respondent.

Case No. 14-12356
Honorable Laurie J. Michelson
Magistrate Judge Patricia T. Morris

---

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS [1] AND DENYING MOTION FOR SUMMARY JUDGMENT [19]**

---

In 2010, Gregory Ingram, Jr. was shot and killed. Three individuals were charged with his death, including Dequeze Dixon. A Michigan jury convicted Dixon of several crimes stemming from Ingram's death, including second-degree murder. Dixon is currently serving a sentence of 179 years in prison. (R. 12, PID 97.)

Dixon has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (R. 1.) Dixon raises a Confrontation Clause challenge, multiple allegations of ineffective assistance of counsel, a due process claim, and a Sixth Amendment violation stemming from a partial courtroom closure. The Court has reviewed the petition, the Warden's response, the state-court record, and Dixon's motion for summary judgment. For the reasons that follow, the Court will DENY habeas corpus relief.

**I.**

Although the following recitation of the facts is taken primarily from the Michigan Court of Appeals' opinion, *see* 28 U.S.C. § 2254(e)(1), it is supplemented by portions of the trial transcript. *See McMullan v. Booker*, 761 F.3d 662, 670 (6th Cir. 2014) (recognizing that it is

unsettled whether the deference owed to state-court factual findings under § 2554(e)(1) applies when the state court adjudicates a claim on the merits such that § 2254(d)(2) applies); *Hawkins v. Woods*, 651 F. App'x 305, 309 n.2 (6th Cir. 2016).[1]

The prosecution's primary witness was Jason Sutton, who was "present during the murder but uninvolved." *Id.* Sutton testified that in the early morning hours of February 26, 2010, he encountered Gary Lee Robinson, Calvin LeSears, and Dixon while walking home from a friend's house. (R. 13-15, PID 887.) Dixon was driving his girlfriend's car at the time, *Dixon*, 2013 Mich. App. LEXIS 1498, at *1, and Sutton asked for a ride home (R. 13-15, PID 890.) Once he got in the car, either Dixon or Robinson said, "If we didn't know who you was, we were going to get you." (R. 13-15, PID 893.) Sutton also saw that LeSears, sitting in the backseat, had a .40 caliber handgun. (*Id.* at PID 903.)

On the way home, the group drove past Gregory Ingram, at which point Dixon said, "There's Greg . . . Let's get on him." (*Id.* at PID 896.) Dixon parked the car on the shoulder and Dixon, Robinson, and LeSears exited the vehicle. *Dixon*, 2013 Mich. App. LEXIS 1498, at *1.

Sutton, who had stayed in the car on his phone, then heard "a lot of gunfire." (R. 13-15, PID 907.) When Sutton looked out of the car window, he saw the group shooting Ingram and he saw Ingram's body on the ground. (R. 13-15, PID 909.) When the group returned to the vehicle, Sutton observed that Robinson had an assault rifle, Dixon had a shotgun, and LeSears had a handgun. (*Id.* at PID 910.) Later, a medical examination of Ingram would reveal that he died of multiple gunshot wounds from at least three different types of guns. *Dixon*, 2013 Mich. App. LEXIS 1498, at *1. Sutton testified, "[Dixon] told me that if I said anything about this, that I will

---

[1] Because it does not affect the outcome, the Court will assume, without deciding, that only § 2254(d)(2) applies.

get kill't and, basically, we won't all go to jail at the same time, so one of us will get you." (*Id*. at PID 924.) Robinson expressed agreement with Dixon. (*Id.*)

Sutton "continued to associate with defendants out of fear that they would believe he had told authorities about the shooting." *Dixon*, 2013 Mich. App. LEXIS 1498, at *2–3. A few weeks after the shooting, Sutton was riding in the same vehicle with his cousin and Dixon when police attempted to pull the vehicle over "for unrelated reasons." *Id.* By the time Sutton realized what was happening, everyone else had jumped out of the moving vehicle. (R. 13-15, PID 934.) Sutton also jumped out, but was apprehended. *Dixon*, 2013 Mich. App. LEXIS 1498, at *3.

While Sutton remained in custody for fleeing and alluding the police (R. 13-15, PID 936), he asked to talk to police about Ingram's murder. *Dixon*, 2013 Mich. App. LEXIS 1498, at *3. Dixon was arrested the same day Sutton told police about the murder, and Robinson was arrested two days later. *Id.* Sutton then picked LeSears out of a photographic lineup, stating that he was 80 percent certain that LeSears was the third individual involved. *Id.* Sutton later identified LeSears with certainty out of a physical lineup. *Id.* Robinson was interviewed and "ultimately provided the police with an inculpatory statement regarding his involvement in the homicide." *Id.*

Robinson, LeSears, and Dixon were tried together (but before separate juries). Dixon's jury convicted him of the following offenses: second-degree murder, Mich. Comp. Laws § 750.317, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, carrying a concealed weapon, Mich. Comp. Laws § 750.227, and possession of a firearm during the commission of a felony (felony-firearm), Mich. Comp. Laws § 750.227b. (R. 13-1, PID 156.)

The Michigan Court of Appeals affirmed Dixon's convictions. *Dixon*, 2013 Mich. App. LEXIS 1498, at *1. The Michigan Supreme Court denied leave to appeal because it was not persuaded to review the questions presented. *People v. Dixon*, 843 N.W.2d 193 (Mich. 2014).

On June 16, 2014, Dixon filed his Petition in this Court. (R. 1.) On December 11, 2014, he filed an Amended Petition. (R. 11.)

**II.**

The standard of review this Court applies to each of Dixon's claims depends on whether the claim was "adjudicated on the merits in state court[.]" 28 U.S.C. § 2554(d); *see also Johnson v. Williams*, 568 U.S. 289, 302 (2013). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), habeas corpus relief may be granted on claims that were adjudicated "on the merits" in state court only if the state-court adjudication of the claim resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). But "[w]hen a state court does not address a claim on the merits, . . . 'AEDPA deference' does not apply and [this Court] will review the claim *de novo*." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

A state-court decision is an unreasonable application of clearly established Supreme Court law when it "applies [Supreme Court] precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citations omitted); *see Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). This is a "difficult to meet . . . and highly deferential standard . . . demand[ing] that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citations and quotation marks omitted).

4

**III.**

Dixon seeks habeas corpus relief on the following grounds:

[I] Defendant was denied his Sixth Amendment right to confrontation and a fair trial by the introduction of a statement by a non-testifying co-defendant which served to incriminate defendant-appellant.

[II] The trial court erred and violated defendant-appellant's right to due process when it denied his request to enforce a trial court order to produce discovery material.

[III] The trial court violated defendant-appellant's due process right to present a defense by excluding a witness who would have testified how the police attempted to recruit him to testify and filled in the details of the crime.

[IV] The trial court's exclusion of the public during the testimony of the state's key witness, violate[d] defendant's constitutional right to a public trial, where closure was based exclusively on an unidentified phone that had rung during trial.

[V] Defendant was denied his Sixth Amendment right to the effective assistance of counsel when his trial counsel failed to object to an unjustifiable closure of the courtroom to the public during the testimony of the state's key witness.

(R. 11, PID 42.) The Court considers these claims in turn.

**A.**

Dixon first asserts a Confrontation Clause violation. The trial court allowed two law enforcement witnesses to testify that when they showed Robinson's witness statement to Dixon (without telling Dixon what Robinson had said), Dixon reacted by asking about his potential sentence for the alleged crime.

The court allowed the law enforcement witnesses' testimony "for the limited purpose of merely saying that [Robinson] made a statement. And [Agent Jakubowski] will not say that it implicates him. She will not say that it exculpates him." (R. 13-18, PID 1249.) So Agent Jakubowski and Sergeant Brown testified to showing Dixon the witness statement. (*Id.* at PID 1259.) Agent Jakubowski said he "observed Mr. Dixon reading [it] . . . thoroughly." (*Id.*) Dixon

5

then asked what kind of sentence he might get for the alleged crime. (*Id.*?) According to Jakubowski, Dixon stated, "I want to cooperate, but I can't" because "I can't do the time." (*Id.* at PID 1259–60.)

Based on Jakubowski's and Brown's testimony, Dixon moved for a mistrial. His counsel argued that Dixon's response to seeing Robinson's statement "certainly was incriminatory or accusatory of Mr. Dixon. Because otherwise, why is Mr. Dixon all of a sudden saying 'What am I going to do?' 'What is my sentence going to be?' 'I can't do fifteen years.'" (*Id.* at PID 1334–35.)

The trial court denied the motion for mistrial (*Id.* at PID 1337), and Dixon raised the issue on appeal. The Michigan Court of Appeals also rejected the argument:

> Dixon asserts that the admission of references to Robinson's statement violated the Confrontation Clause, under which 'out-of-court testimonial statements are inadmissible unless the declarant appears at trial or the defendant has had a previous opportunity to cross-examine the declarant.' *People v Nunley*, 491 Mich 686, 698; 821 NW2d 642 (2012), citing *Crawford v Washington*, 541 U.S 36, 51-53; 124 S Ct 1354; 158 L Ed 2d 177 (2004). However, it does not preclude the use of out-of-court statements, even testimonial statements, for purposes other than establishing the truth of the declarant's assertion. *People v Chambers*, 277 Mich App 1, 10-11; 742 NW2d 610 (2007) (citation omitted). In particular, the Confrontation Clause is not implicated by 'a statement offered to show the effect of the out-of-court statement on the hearer.' *Id.* at 11. Robinson's statement here was not offered for its truth—indeed, its contents were not even disclosed—but rather only for the purpose of observing Dixon's reaction to reading that statement during his interrogation by the police. Consequently, there was no violation of defendant's right of confrontation. *See People v Johnson*, 100 Mich App 594, 598–599; 300 NW2d 332 (1980).

*Dixon*, 2013 Mich. App. LEXIS 1498 at *4–5.

This ruling on the merits was not "contrary to" or an "unreasonable application" of *Crawford*. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). "The Supreme Court's decision in *Crawford v. Washington* initiated a sea change in Confrontation Clause jurisprudence." *McCarley v. Kelly*, 801 F.3d 652, 662 (6th Cir. 2015). The Court held that the clause "prohibits the introduction of testimonial statements of witnesses absent from trial, unless the 'declarant is

6

unavailable, and . . . the defendant has had a prior opportunity to cross-examine [the declarant].'" *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015) (citing *Crawford*, 541 U.S. at 51). But to establish a Confrontation Clause violation, "the defendant must as an initial matter establish that the government used an out-of-court statement for its truth." *United States v. King*, 865 F.3d 848, 850 (6th Cir. 2017). In other words, a testimonial statement must also be testimonial hearsay. *See Michigan v. Bryant*, 562 U.S. 344, 369 (2011).

Thus, the *Crawford* sea change did not wash away all pre-*Crawford* precedent. Indeed, the *Crawford* court cited with approval *Tennessee v. Street*, 471 U.S. 409 (1985). *Street* helps show why the Michigan Court of Appeals' rejection of Dixon's Confrontation Clause argument was reasonable. In *Street,* a defendant testified at trial that police coerced his confession by showing him a written statement previously made by his co-defendant. *Id.* at 411. In rebuttal, the State called the Sheriff, who read the statement into evidence. *Id.* The trial court instructed the jury that the statement was admitted "not for the purpose of proving the truthfulness of [the codefendant's] statement, but for the purpose of rebuttal only." *Id.* at 412. The Supreme Court found no Confrontation Clause violation where the state introduced an accomplice's confession solely to rebut a defendant's testimony that police used a statement to coerce the defendant's confession. *Id.* at 414.

In *Crawford*, the Supreme Court cited *Street* for the proposition that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 60 n.9; *see also Adams v. Holland*, 168 F. App'x 17, 21 (6th Cir. 2005).

Here, as recognized by the Michigan Court of Appeals, the content of Robinson's prior statement was not even introduced at trial—merely the fact that he had made a statement, and for

7

the purpose of giving context to Dixon's reaction. Accordingly, the state court reasonably applied *Crawford* and its progeny and Dixon is not entitled to habeas relief on this claim. *Cf. McPherson v. Woods*, 506 F. App'x 379, 384 (6th Cir. 2012) (holding that the Michigan Court of Appeals did not err in its conclusion that "evidence of the deceased Cherell King's statement was introduced not for the truth of the matter asserted, but rather to show 'that defendant was aware of King's statement in light of defendant's testimony that King was the shooter and as part of the prosecutor's theory that defendant changed his story several times and could not be believed.'").

**B.**

Dixon next claims that the trial court erred when it allowed the prosecutor to question Devonda Jiles, Dixon's girlfriend at the time of the shooting, about videotaped statements she made to a detective. (R. 11, PID 64.) At the time, Dixon's counsel objected because he had not been given the videotape. (R. 13-15, PID 809.) On appeal, Dixon raised several claims related to the videotape.

Dixon argues that the prosecutor violated a discovery order by failing to give his attorney the tape. To the extent that this claim is grounded in state discovery rules, it fails. "There is no general constitutional right to discovery in a criminal case[.]" *Weatherford v. Bursley*, 429 U.S. 545, 559 (1977).

Dixon also says that the prosecutor's failure to turn over the tape violates his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); (R. 11, PID 64.) *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

The Michigan Court of Appeals addressed the issue as follows:

8

> The interviewing officer testified that the recording had been in his file when he met with defense counsel, but they did not request to view it. The trial court accepted this assertion. '[I]f resolution of a disputed factual question turns on the credibility of witnesses or the weight of the evidence, [this Court] will defer to the trial court, which had a superior opportunity to evaluate these matters.' The trial court also allowed defense counsel to review the videotape outside the presence of the jury, affording Dixon an opportunity to evaluate the evidence and formulate a strategy to deal with the content. As such, Dixon is unable to demonstrate that the prosecution actively suppressed the evidence. In any event, none of the contents of the recording were clearly exculpatory, and it was admitted only for the purpose of impeaching Jiles's credibility. As discussed, there was substantial other evidence of Dixon's guilt, so had the [videotape of Jiles's police interview] been disclosed to the defense, [no] reasonable probability exists that the outcome of the proceedings would have been different.

*Dixon*, 2013 Mich. App. LEXIS 1498, at *8 (internal quotations omitted).

This was not an unreasonable application of *Brady*. It is true that the prosecutor's "duty to disclose [*Brady* material] is applicable even though there has been no request by the accused[.]" *Strickler*, 527 U.S. at 280 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). However, a *Brady* violation involves three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

In this case, defense counsel gained access to the alleged *Brady* material during trial. The trial court gave defense counsel time to review the tape and time to formulate a strategy to deal with its contents. Thus, as found by the Michigan Court of Appeals, the state did not suppress the evidence.

Moreover, Dixon has not explained how the delay in reviewing the tape prejudiced him. Dixon's counsel stated that the purpose of introducing the video was to impeach Jiles's statement that she did not remember telling Sergeant Brown that her car, which Dixon was using when he was apprehended, had been stolen. (R. 13-15, PID 832.) Yet, counsel's strategy throughout the

trial was to (1) emphasize the fact that three weapons were involved in order to cast doubt on Dixon's guilt, and (2) discredit the prosecution's main witness, Sutton. (*See, e.g.*, R. 13-13, PID 657; R. 13-21, PID 1636.) This strategy did not change after defense counsel viewed the video, as evidenced by counsel's closing statement. (R. 13-21, PID 1637.)

Accordingly, the Michigan Court of Appeals reasonably applied *Brady* and Dixon is not entitled to habeas corpus relief for this claim.

## C.

Dixon next argues that the trial court committed constitutional error when it ruled that his proposed witness, Devon Slater, had no relevant testimony to offer and refused to let Slater take the stand. (R. 11, PID 68.)

During trial, defense counsel represented that Slater "would testify . . . [he] was listed as a defense witness in an entirely different case and Sergeant Brown was in charge of that case and . . . [after interviewing Slater regarding that case] Sergeant Brown then . . . moved into a discussion of . . . any knowledge [Slater] might have about the Gregory Ingram case." (R. 13-20, PID 1584.) Thus, Dixon sought to offer Slater's testimony to show that Brown talked to him "in an attempt to recruit this witness . . . as a witness in the case even though he didn't know anything about the case." (*Id.* at PID 1584.)

In rejecting this claim, the Michigan Court of Appeals ruled:

> The alleged solicitation of a different jailhouse 'snitch' was not relevant to Sutton's testimony and did not serve to prove that Sutton's testimony was false or render his version of events incredible. At most, inquiring into the alleged recruitment of a 'snitch' amounted to an attempt at impeaching the testifying officer regarding a collateral matter unrelated to Dixon's guilt, so it was within the trial court's discretion. MRE 608(b); *People v Wofford*, 196 Mich App 275, 281; 492 NW2d 747 (1992). Extrinsic evidence may not be used to impeach a witness on a collateral matter, even where such evidence constitutes a prior inconsistent statement otherwise admissible under MRE 613(b). *People v Rosen*, 136 Mich App 745, 758; 358 NW2d 584 (1984).

10

*Dixon*, 2013 Mich. App. LEXIS 1498, at *10–11. The state appellate court concluded, "We find no legal error or abuse of discretion." *Id.* at *11.

The Supreme Court has ruled, "[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, "[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (alteration in original, quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). Accordingly, "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689–90.

The Court of Appeals' determination was not "an objectively unreasonable application" of this Supreme Court precedent. *See Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003). As another court in this district has explained,

> [A] federal habeas court will not disturb a state court's exclusion of evidence which it finds is irrelevant unless the relevance and probative value of such evidence is so apparent and great that excluding the evidence denies the petitioner the due process of law. The inquiry in reviewing a claim of improper exclusion of evidence is whether the evidence was rationally connected to the crime charged and, if its exclusion was so prejudicial as to deprive the defendant of a fundamentally fair trial.

*Jones v. Smith*, 244 F. Supp. 2d 801, 814 (E.D. Mich. 2003). In this case, defense counsel argued that Slater's testimony could have illustrated that Sergeant Brown had recruited witnesses to testify who had not actually witnessed the crime, thus potentially discrediting Brown. But such testimony

11

would have little bearing on the actual events giving rise to Ingram's death and does not implicate Sutton's truthfulness.

Accordingly, the Court will not grant habeas corpus relief on this claim.

**D.**

Dixon next argues that the trial court's decision to close the courtroom during a portion of the witness testimony violated his Sixth Amendment right to a public trial. (R. 11, PID 72.)

As a threshold matter, Respondent urges that Dixon's failure to make a contemporaneous objection at trial procedurally defaults his courtroom closure claim, thus barring habeas review. (R. 25, PID 2245.) Dixon believes Respondent waived any procedural default argument. However, analyzing the merits of Dixon's substantive claim "presents a more straightforward ground for decision, prompting [this Court] to consider these issues at the outset." *McLemore v. Bell*, 503 F. App'x 398, 404 (6th Cir. 2012) (quoting *Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009)) (internal quotations omitted). Therefore, the Court will turn to the merits of Dixon's argument.

The Michigan Court of Appeals reviewed the courtroom closure claim for plain error. *See Dixon*, 2013 Mich. App. LEXIS 1498, at *14. That decision deserves AEDPA deference. *See Stewart v. Trierweiler*, No. 16-2149, 2017 U.S. App. LEXIS 15030, at *10 (6th Cir. Aug. 14, 2017) (holding that a state court's plain-error review is an adjudication on the merits and therefore deserving of AEDPA deference).

More specifically, the Michigan Court of Appeals ruled as follows:

At the beginning of Sutton's testimony, the judge heard a ringing telephone in the courtroom and stated:

> Who's got the ringing phone? Whoever's got it better give it up or I'm going to kick everybody out of the courtroom. Who's got the ringing phone? Okay, everybody leave the gallery. You're gone. Everybody's gone.

12

> The courtroom was then cleared. When counsel requested to approach, the following interaction transpired:
>
>> The Court: This is my courtroom, sir. Everyone will leave.
>>
>> Dixon's Counsel: No. I'm not—I'm not—that's not my concern. I don't care who's in the gallery. That's not my concern.
>
> The court conducted a bench conference with counsel for approximately two minutes before Sutton's testimony resumed. It appears that no spectators were permitted to re-enter the courtroom that day, although it also appears that a representative from the media, who had previously requested and obtained permission to video-record Sutton's testimony, was permitted to continue to do so. On the next day of trial, the restriction regarding spectators was not implemented based on the trial court's permission to counsel to open the courtroom despite the lack of seats available, presumably due to the presence of three juries.
>
> In our view, the trial court's reaction was extreme and excessive; justice is better served by a calmer and more measured response. However, it appears on balance that the trial court's closure was less 'to exclude the public, but to control 'courtroom distractions.' *People v Bails*, 163 Mich App 209, 211; 413 N.W.2d 709 (1987). In any event, none of the defendants objected to the closure, so even if we were—hypothetically—to conclude that the closure was plainly erroneous, reversal would only be warranted if the closure also affected defendant's substantial rights. We find no indication that Dixon is actually innocent. Because the courtroom closure has not been demonstrated to have impacted the ability of counsel to examine the witness thoroughly or in any manner 'seriously affect[] the fairness, integrity, or public reputation of [the] judicial proceedings,' Dixon cannot demonstrate entitlement to a new trial. *Carines*, 460 Mich at 774.

*Dixon*, 2013 Mich. App. LEXIS 1498, at *12–14.

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. The right is intended for the benefit of the defendant, so that "the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). "The presumption of openness may be overcome only by an overriding interest based on [specific, articulated] findings that closure is essential to preserve

13

higher values and is narrowly tailored to serve that interest." *Id.* at 45. In the absence of this analysis, a complete closure of a courtroom constitutes structural error, because the deprivation of the right to a public trial "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (citing *Waller*, 467 U.S. at 49). Here, the trial court did not consider reasonable alternatives to closing a portion of the proceeding to all spectators except one journalist and did not make findings adequate to support the closure. *See* Waller, 467 U.S. at 47–48.

But Dixon has still not shown that the Michigan Court of Appeals' decision is an unreasonable application of or contrary to Supreme Court precedent. The state court could reasonably conclude that under Supreme Court precedent, a defendant can waive the public-trial right guarantee by failing to object to the closure of the courtroom. *See Peretz v. United States*, 501 U.S. 923, 936–37 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960), for the proposition that the "failure to object to closing of courtroom is waiver of right to public trial"); *see also Harrison v. Woods*, No. 12-11364, 2014 U.S. Dist. LEXIS 170536, *8 (E.D. Mich. Dec. 10, 2014) ("Although the right to a public trial is a fundamental right, it can also be waived if a habeas petitioner either acquiesces to the closure of the courtroom or fails to object.") (citing *Johnson v. Sherry*, 586 F.3d 439, 444 (6th Cir. 2009)).

This failure to object to the courtroom closure distinguishes this case from *Waller v. Georgia*, 467 U.S. 39 (1984), the case relied upon by Dixon. *Waller* holds that defendants are not required to show prejudice in order to prevail on a preserved courtroom closure claim. *Waller*, 467 U.S. at 49. But *Waller* dealt with a prosecutor's opposed motion to close a suppression hearing. And *Waller* turned on the state court's inability to justify the closure, given the Sixth Amendment concerns raised by Waller's counsel. *See Waller*, 467 U.S. at 48 (reasoning that the prosecution

must advance an overriding interest in the closure and the trial court must make findings adequate to support the closure). By contrast here, the defense did not object to the closure and defense counsel told the trial court he did not believe the brief exclusion of spectators warranted any concern. (R. 13, PID 883.)

Additionally, the Supreme Court has not "clearly established" that prejudice is *always* the result of a courtroom closure, let alone an un-objected to closure. *See Levine*, 362 U.S. at 619–20 ("Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal."); *accord Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911–12 (2017) (reasoning that not every trial closure claim results in a "fundamentally unfair trial" and therefore prejudice is not automatic where an objection is not raised at trial). Indeed, in *United States v. Gonzalez-Lopez*, the Supreme Court conceded that the touchstone of a structural error is not assumed prejudice, but rather the "difficulty of assessing the effect of the error." 548 U.S. 140, 149 n.4 (2006). And in *Presley v. Georgia*, the Court reasoned that properly articulated safety concerns may justify a courtroom closure. *See* 558 U.S. 209, 215 (2010).

Thus, the Court cannot find that the decision of the Michigan Court of Appeals was contrary to or an objectively unreasonable application of Supreme Court law. For that reason, Dixon is not entitled to habeas corpus relief on his Sixth Amendment violation claim.

### E.

Alternatively, Dixon argues that his trial counsel's failure to object to the courtroom closure constitutes ineffective assistance of counsel. (R. 11, PID 80.)

The trial court addressed this claim as follows:

> Dixon contends that his trial counsel was ineffective for failing to object to the closure of the courtroom to the public. We disagree. Because defendant did not seek a *Ginther* hearing, we review only mistakes apparent on the record. *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002). 'In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different.' *People v Trakhtenberg*, 493 Mich 51; 826 NW2d 136 (2012). As discussed, we perceive no reason why the outcome of the proceedings would have been different had the courtroom not been closed, so we are unable to conclude that counsel's failure to object to that closure could have affected the outcome. Furthermore, given the importance of Sutton's testimony and the fact that the atmosphere in the courtroom was apparently tense—and had already been seriously disrupted the previous day—we are unable to say that it was unsound strategy for counsel to decline to object to the closure. 'This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight.' *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

*Dixon*, 2013 Mich. App. LEXIS 1498, at *14–15.

To establish ineffective assistance, Dixon must show that his trial counsel's performance was deficient and that he was prejudiced as a result. *Strickland v Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient where it falls below an objectively reasonable standard. *Id.* at 688. This standard is "highly deferential"—thus, "doubly so" on federal habeas review—and requires a defendant seeking federal collateral relief from a state conviction based on a defense counsel's allegedly deficient performance under § 2254(d) to prove that the state court's application of the *Strickland* standard was "unreasonable," not simply that counsel's performance fell short of *Strickland*. *Harrington v. Richter*, 562 U.S. 86, 101 (2011.) Moreover, this Court to "apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id*. at 104–05.

The Michigan Court of Appeals reached the reasonable conclusion—supported by the record—that Dixon's trial counsel performed effectively. Dixon's counsel informed the judge, after the closure, that clearing spectators from the gallery was not his concern. (R. 13, PID 883.)

16

Numerous strategic reasons could support trial counsel's conclusion, including a belief that eliminating the distractions caused by the spectators allowed the jury uninterrupted focus on witness testimony or decreased the tense atmosphere in the courtroom. Or counsel may have thought that the reporter's continued presence obviated any concern about structural error. The state court also perceived "no reason why the outcome of the proceedings would have been different had the courtroom not been closed." *Dixon*, 2013 Mich. App. LEXIS 1498, at *14–15. Dixon contends that *Strickland* prejudice should be presumed when dealing with a structural error. But in the absence of any controlling Supreme Court precedent to support this argument, Dixon cannot show that the Michigan Court of Appeals unreasonably applied *Strickland*.[2]

## IV.

For the foregoing reasons, it is ORDERED that Dixon's petition is DENIED. The Court also believes that no reasonable jurist would find that Dixon's claims have merit, so a certificate of appealability will not issue from this Court. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). But if Dixon nonetheless chooses to appeal, he may proceed *in forma pauperis*. *See* 28 U.S.C. § 1915(a)(3).

---

[2] After the Michigan Court of Appeals ruling, the United States Supreme Court addressed the showing that is necessary when a defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance-of-counsel claim. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1913 (2017). More specifically, the Court ruled that "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id*. at 1911. Thus, the Court finds no basis to accept Dixon's invitation to apply a presumption of prejudice.

Finally, Dixon's motion for summary judgment (R. 19) is DENIED as moot.

SO ORDERED.

Dated: September 26, 2017

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 26, 2017.

s/Keisha Jackson
Case Manager